**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

UNITED STATES OF AMERICA

v.                                                    CRIMINAL  ACTION  NO. 3:11-00055

TERRENCE ANTOINE McARTHUR

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant's Motion to Suppress (ECF No. 27 ).  Defendant moves to suppress the fruits of a search of a residence at 525 30th Street in Huntington, West Virginia.  For reasons stated in this Memorandum Opinion and Order, the motion is **DENIED**.

**I.**

In the early morning hours of December 17, 2010, the Huntington Police Department (HPD) received an anonymous child welfare call reporting that children were in a home with drugs and guns at 525 30th Street in Huntington, West Virginia.  At around 4:00 am, several HPD officers went to the 525 30th Street residence, knocked on the door, and were permitted to enter by Patrick Wiles, one of the tenants.  The officers told Wiles they were there in response to a child welfare call, and asked to look around the residence.  Wiles assented.

On entering, two officers smelled burning marijuana and asked Wiles where the smell was coming from.  He indicated toward a bedroom at the back of the house.  The officers proceeded through the living room, where five children were located, opened the door to this back bedroom, and turned on the light.  Defendant and his girlfriend, Melanie Hadden, were asleep in that room,

but awoke when officers entered.  Officers noticed a firearm on the shelf of an open closet; a baggie of marijuana was also in plain view.  The officers took Hadden to the other bedroom of the house, detaining Defendant in the room where they found him.  The officers asked Hadden, Wiles, and Wiles' girlfriend, Virginia Cooper, for consent to search the home.  Believing they consented, officers radioed for consent-to-search forms to be brought to the residence.  Two officers explained the forms to Hadden, Wiles, and Cooper, then Hadden signed one form while Wiles and Cooper signed another, jointly.  Officers then searched the home more thoroughly, recovering heroin from a Santa Claus hat on the shelf in the closet where the gun had been located.  Another firearm, drugs, and drug paraphernalia were also found on the premises.  Defendant was taken to the police station, where he signed a *Miranda* waiver and admitted to possession of the heroin and the two guns found on the premises.[1]

## II.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV.  Although warrantless searches are generally unreasonable, a warrantless search can be conducted in the absence of probable cause or reasonable suspicion when voluntary consent is obtained. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  When, as in this case, the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was knowing and voluntary.  *United States v. Mendenhall*, 446 U.S. 544,

---

[1] Other drugs were found on the premises, but it is unclear to whom they belonged; Defendant is only charged with offenses relating to the heroin and the two guns, so the Court considers only these items.

-2-

557 (1980); *Schneckloth*, 412 U.S. at 227 ("whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."); *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007). Where consent is knowing and voluntary, the scope of that consent is limited to that which the searching police officers may have reasonably understood to be included within the consent. *Florida v. Jimeno*, 500 U.S. 248, 251(1991) ("The standard for measuring the scope of a suspect's consent . . . is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

If a home is occupied by multiple people, the consent exception applies "when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant," even if that co-occupant "later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). This exception extends to searches made pursuant to "apparent authority," that is, "searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Id*. at 109.

Co-tenant consent has some limits; for example, co-tenants may only consent to the search of areas under "common authority." *See United States v. Matlock*, 415 U.S.164, 171 n. 7 (1974) ("Common authority is not merely a question of property interest but requires evidence of mutual use by one generally having joint access or control for most purposes."). Courts have recognized that spaces and items clearly under the control of only one tenant may be outside the scope of a co-tenant's consent to the search. *Buckner*, 473 F.3d at 551 ("Although common authority over a general area confers actual authority to consent to a search of that general area, it does not

-3-

'automatically ... extend to the interiors of every discrete enclosed space capable of search within the area.'") (citing *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978)). *Compare United States v. Kinney*, 953 F.2d 863 (4th Cir. 1992) (tenant who had lived in an apartment for four months could not consent to search of a closet which co-tenant had kept locked at all times, as her "lack of mutual use, general access or common authority over the closet prohibited her from issuing valid consent to search it."), *with United States v. Pender*, 261 Fed Appx. 576, 577 (4th Cir. 2008) (unpublished) (girlfriend of defendant could give valid consent to the search of a closet in the bedroom she shared with the defendant, because she "was a leaseholder of the apartment and shared the master bedroom with [the defendant]," "[t]he closet contained articles clearly belonging to a woman," and "even if the closet contained more men's items than women's, there was nothing to alert the officers that [defendant's girlfriend] lacked mutual access to the closet—it was not locked and nothing inside it was in a locked or sealed container.").

Co-tenant consent may also be limited where a hierarchy among tenants in authority over the premises makes the consent of one insufficient to validate a search of the entire premises. For example, although a short-term guest has a reasonable expectation of privacy in his temporary quarters, *Minnesota v. Olson*, 495 U.S. 91, 99 (1990), his control over all portions of the home where he stays may not be as extensive that of the owner, or a more permanent co-tenant. *See Olson*, 495 U.S. at 99 ("From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone *but his host and those his host allows inside*.") (emphasis added); *see also State v. Grant*, 614 N.W. 2d 848, 853 (Iowa App. 2000) ("an overnight guest's legitimate expectation of privacy does not vitiate the homeowner's ability to consent to a search of his home.") (collecting

cases).  With these principles in mind, the Court turns to the December 17, 2010 search of 525 30th

Street.

## III.

### (A) Patrick Wiles' Initial Consent

Patrick Wiles, a lessee of 525 30th Street, consented to a child welfare check of the premises

when police officers first arrived at the residence.  Defendant does not dispute that Wiles' consent

was knowing and voluntary, but, instead, argues that the search of the residence was outside the

scope of Wiles' consent.

When Wiles answered the door, he allowed the HPD officers inside, and they informed him

that they were responding to a child welfare call.  They asked to look around, and he consented.

Consequently, Wiles' consent could be reasonably construed to include entry into, and some

examination of, all rooms in the house that children could access, including the bedroom where

Defendant was asleep.  *See Jimeno*, 500 U.S. at 251; *United States v. Williams*, 199 Fed. Appx. 828,

832 (11th Cir. 2006) (unpublished) (officers following an anonymous tip regarding child welfare

asked for and received consent to "take a look around the house;" under these circumstances, "a

reasonable person would recognize that his consent to search the house would extend to areas where

his children had access.").  On entering the back bedroom and looking around, officers saw a gun

and marijuana in plain view.  Because the officers were legitimately in the room when they saw the

gun and the marijuana, these items were not the fruit of an illegal search and Defendant's motion

as to these items is **DENIED**.[2]

The next issue is whether Wiles' initial consent extends to the officers' closer examination

of the premises, specifically, whether Wiles had the actual or apparent authority to consent to an in-

depth search of the back bedroom where the heroin and second gun were found.

Some facts indicate that Wiles may not have had actual authority to consent to such a search

of the closet of the back bedroom. The bedroom was occupied by an adult couple, asleep. The

heroin was found concealed inside a Santa Claus hat, so some attempt was made to conceal it from

view. See *Block*, 590 F.2d at 541 ("the law's 'enclosed spaces' . . . are frequently the objects of his

highest privacy expectations, and that the expectations may well be at their most intense when such

effects are deposited temporarily or kept semi-permanently in public places or in places under the

general control of another."). Defendant and Melanie Hadden had been using the bedroom at the

525 30th Street residence for about a week at the time of the search, they planned to stay

indefinitely, and they helped pay some household expenses. Under these facts, Defendant's quasi-

residence may have allotted him greater control over the bedroom than had he been a mere overnight

---

[2] Alternatively, once the officers were inside the residence, the smell of marijuana—and Wiles' indication that it came from the back bedroom—justified the officers' initial entry into that room. The Fourth Circuit, along with a number of other circuits, has expressly adopted the "plain smell" exception to the warrant requirement. *See Johnson v. United States*, 333 U.S. 10, 13 (1948) (probable cause may be found in a distinct odor of an illegal substance); *United States v. Haley*, 669 F.2d 201, 203 (4th Cir. 1982) (scent of marijuana gives rise to probable cause); *United States v. Stewart*, 148 F. Supp. 2d 236 (E.D. Va. 2001) (plain smell of marijuana in defendant's coat supported probable cause); s*ee also United States v. Yamba*, 506 F.3d 251, 257 (3d Cir. 2007) (collecting cases). In this case, two police officers testified that they smelled marijuana after they entered the 525 30th Street residence. One asked Wiles where the smell was coming from, and Wiles indicated toward the back bedroom. Therefore, the officers entry into that bedroom, and search for marijuana, was reasonable

guest of Cooper and Wiles, and the fact that he and his girlfriend had ongoing use of the back bedroom may have limited the authority of Wiles—his host—to consent to its search.

At the same time, the applicable inquiry is whether Wiles had *apparent* authority to consent to the search of the back bedroom. The residence was occupied by two adult couples and five children, and any exclusive use of the back bedroom by Defendant and Hadden may not have been obvious to police officers. Only Wiles and Cooper were leaseholder residents of 525 30th Street, and, when officers asked Defendant if he lived at the residence, he said he did not. Further, although the bedroom was being used as such by Defendant and Hadden at the time of the search, the open closet and room had all kinds of belongings in it, indicating "mutual use" of the room by the other residents of the home, not the kind of exclusive use that would limit Wiles' consent to its search. *See Matlock*, 415 U.S. at 171 n. 7; *see also* Wayne R. LaFave, Search and Seizure § 8.5(d) (4th ed. 2004) ("if, for example, [a guest] room contains personal effects of the host which it could be expected the host would want ready access to on a regular basis, this is a factor in favor of upholding the host's consent [to its search]."); *United States v. Pender*, 261 Fed Appx. 576, 577 (4th Cir. 2008) (unpublished) (girlfriend of defendant could give valid consent to the search of a closet in the bedroom she shared with the defendant, in part because the items therein indicated that she had mutual access to the closet). Last, the closet door was open, and although the heroin was concealed from plain view in a Santa Claus hat, the hat was not the kind of locked or sealed container that would indicate a serious attempt to exclude others from access, nor was it the kind of obviously personal item that would indicate a lack of mutual use of the closet. Rather, a Santa Claus hat located in a home housing numerous people, including children, is the kind of object that might indicate the closet was a shared, not exclusive, space.

-7-

In sum, it was reasonable for officers to believe that Wiles had authority to consent to a search of the premises for hazards to children, and to inspection of items and areas thought to present the hazards reported in the child welfare call.  This apparent authority was not limited by Defendant's status as a guest, or even co-tenant, of the residence.

**(B)    Consent Forms**

As an additional or alternative grounds for the search, Melanie Hadden, Patrick Wiles, and Virginia Cooper all verbally consented to the search, then later signed written consent-to-search forms authorizing a search of the residence's premises.  ECF No. 45, Ex. 1-2.  Both Wiles and Cooper were leaseholders of the home, and Hadden shared the back bedroom with the defendant, so they all had authority to consent to the search of the back bedroom.  However, even if the particulars of the cotenancy among Wiles, Cooper, Hadden, and Defendant were such that the Defendant had some exclusive control or expectation of privacy in the back bedroom, the other three adults had at least apparent authority to consent to the search.  By the time the consent forms were signed, officers had observed Hadden asleep in the shared bedroom, and had been permitted to look around the house by Wiles.  Therefore, it was reasonable for officers to believe that Hadden, Wiles, and Cooper could consent to the search.

Defendant challenges this consent, arguing that the forms were not signed voluntarily, and are therefore invalid.  Virginia Cooper testified that she only signed the consent form because police officers threatened to place her children in CPS custody if she refused, and stated that Hadden, whose children were also in the residence, heard the same threats.  However, Cooper's testimony was neither specific nor credible.  Cooper admits she does not remember many key facts about the night of the search, including the time of night the police officers arrived at the house, the gender

of the officer who made the alleged threat, and the specifics of the threat.  Two police officers testified that they made no such threats, but instead read and explained the consent forms to Cooper, Hadden, and Wiles, and witnessed their signatures.  Although the government bears the burden of proving that consent was voluntary, they put forth evidence that it was, and Cooper's testimony is not sufficiently credible to demonstrate otherwise.  *See United States v. Boone*, 254 F.3d 352, 362 (4th Cir. 2001) (written evidence of consent supports a finding that consent was voluntary).  Further, although the Court does not credit Cooper's statement that she was coerced, nor her speculation that Hadden was coerced, the Court notes that there are no such allegations as to Patrick Wiles.  Wiles also signed a valid consent form, and in the absence of any explicit objection by another tenant, Wiles' valid consent form alone would be sufficient validation for the search.  *See Randolph*, 547 U.S. at 106.  The Court therefore finds that the verbal and written consents of Hadden, Wiles, and Cooper validated the officers' search of the residence at 525 30th Street.

## IV.

The search of 525 30th Street was warrantless, but justified by the voluntary consent of three different individuals.  Patrick Wiles' consent to check on child welfare validated the officers' initial entry into the back bedroom and plain view of one gun and some marijuana.  That same consent permitted the officers to inspect those items and the areas around them.  Alternatively, or additionally, the officers obtained written consent-to-search forms from Patrick Wiles, Virginia Cooper, and Melanie Hadden, which were signed knowingly and voluntarily.  Thus, the search was within the bounds of the Fourth Amendment, and Defendant's Motion to Suppress is **DENIED** in its entirety.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel and the defendant, the U.S. Attorney's Office, the U.S. Probation Office, and the U.S. Marshals' Service.

ENTER:        April 13, 2012

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE